

**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

MAR 2 8 2022

MITCHELL R. ELFERS
CLERK

**JARROD BLANDIN**
636 Mountain Shadows Rd NE
Corrales, NM 87048

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JARROD BLANDIN,          Case No.: **22cv228 KK**

Plaintiff,

v.

KEVIN SMITH, in his individual capacity as a New Mexico State Police Officer,
NEW MEXICO DEPARTMENT OF PUBLIC SAFETY,
MARC SHEA, TIM JOHNSON, ROBERT THORNTON, DANIEL CHAVEZ, and KURTIS
WARD, in their individual capacities.

Defendants.

_____/

## **COMPLAINT AND JURY TRIAL DEMANDED**

COMES NOW, Plaintiff, JARROD BLANDIN (hereinafter "MR. BLANDIN" or
"Plaintiff"), and hereby files this Complaint against KEVIN SMITH (hereinafter "MR. SMITH"
or "Officer Smith") in his individual capacity as a New Mexico State Police Officer, the NEW
MEXICO DEPARTMENT OF PUBLIC SAFETY (hereinafter the "DEPARTMENT"), MARC
SHEA, TIM JOHNSON, ROBERT THORNTON, DANIEL CHAVEZ, and KURTIS WARD
(hereinafter collectively, the "Defendants").

## INTRODUCTION

This civil rights action seeks compensatory and punitive damages from Defendants for violating various rights under the United States Constitution and state law in connection with an incident that took place on or about May 7, 2021.

## JURISDICTION AND VENUE

1. Plaintiff in this action seeks relief under the Fourth and Fourteenth Amendments of the United States Constitution, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, including compensatory damages, punitive damages, costs, and attorney's fees, pursuant to 42 U.S.C. §1988 and pursuant to 28 U.S.C. § 1331.

2. Venue is proper in this court, pursuant to 28 U.S.C. § 1391(b), as all Defendants work and/or reside in this District, and all of the acts and omissions giving rise to this action occurred in Sandoval and Bernalillo Counties.

3. The Court has federal question jurisdiction over Plaintiff's federal law claims, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). Plaintiff's state law claims are related to these federal claims and form a part of the same case or controversy. The Court accordingly has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a).

4. All conditions precedent to the maintenance of this action, have been performed, have occurred prior to its institution, or have been waived.

## PARTIES

5. At all times material hereto, Plaintiff was a resident of Corrales, NM, and is otherwise sui juris.

6. New Mexico Police Officer, KEVIN SMITH.

7. The NEW MEXICO DEPARTMENT OF PUBLIC SAFETY is a cabinet level department of the State of New Mexico and is responsible for the health and safety of the citizens of New Mexico.

8. MARC SHEA, TIM JOHNSON, ROBERT THORNTON, DANIEL CHAVEZ, KURTIS WARD and GREGORY RAMIREZ were aware of Defendant Smith's lack of training and history of unlawful seizures and excessive use of force neglected to intervene and nonetheless assigned him law enforcement duties on behalf of the New Mexico State Police and the New Mexico Department of Public Safety.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

9.  I was stopped by a NM State Police Officer, Kevin Smith ("Officer Smith"), at a DWI checkpoint. I was in an unfamiliar car, looking for the button to lower the window, while Officer Smith was aggressively pounding on the car window very loudly with his flashlight. A simple rapping with his fingers would have been sufficient to capture my attention and not cause anxiety. I have tattoos on my hands and arms and at the time had a shaved head, which may have given him a false indication of my character, but body tattoos are extremely common and not a reason to falsely stereotype or profile and accuse a person of a crime. The body cam footage sent to me has no audio of the initial contact and was worn at waist level, not at shoulder level so that actual facial evidence is captured, both of which is against standard practice. Facial interaction and audio capture should be on at all times for factual visual and audio evidence. When I found the button and rolled the window down, Officer Smith falsely accused me of driving while intoxicated. He didn't ask if we had been drinking, he asked me why my vehicle smelled of alcohol and then asked how much I had been drinking. These questions were stated in the form of accusations, without any supporting evidence. Both my passenger and I stated simultaneously, "We don't drink."

10. Officer Smith refused to accept our answer, asking why he smelled alcohol and naming things that smell like alcohol like hand sanitizer and cologne, none of which were in the car. There was absolutely nothing that could have smelled like alcohol in our car. He kept insisting that he smelled alcohol, at which point my PTSD was causing my senses of hearing and vision to diminish and causing me to have hyper-focus. I focused on the patch

he wore, which to me was a desecrated American flag with a blue stripe through it which was used by the radical white extremists during the insurrection at the US Capital, so I associated him with those gang members and murderers. In addition to the tunnel vision I was experiencing, my ability to communicate clearly and articulately was diminishing. I began to lose control of the volume of my voice as I began to become terrified knowing that I was helpless at this point in my response to his aggression and escalation. I sensed that he used this tactic on a regular basis by the way he began backing up his initial lie with additional lies. That's when I stated that he was lying, that he didn't smell alcohol and that his false narrative smelled like bullshit. His voice was calm but condescending and full of sarcasm. He laughed and said that bullshit doesn't smell like alcohol. I felt that he was enjoying antagonizing me and wanted to push me even further.

11. I began to feel even more unsafe at this point, due to the violent look in Officer Smith's eyes and the aggressive manner in which he was conducting himself. Nothing scares me more than a dishonest and aggressive police officer. I had informed him that I was experiencing an episode of severe PTSD, but he ignored me, so in a state of panic I called 911 asking for help. While I was distracted on the 911 call, Officer Smith was antagonizing me, saying "Listen here, Peter Pan" and asking me to put the car in park. I did put the car in park and asked for a supervisor. Another officer, Daniel Chavez ("Officer Chavez"), stepped up and identified himself as a supervisor. I asked Officer Chavez to back Officer Smith away from me so that I could talk to him. Instead, Officer Chavez just disengaged with me, allowing Officer Smith to continue antagonizing me. Officer Smith was accusing me sarcastically of being unable to multi-task, which would make me incapable of driving, but most people can't listen to two conversations at one time, so that has nothing to do with

my ability to multi-task or drive. I didn't hear Officer Smith's next command, which was to get out of the car, because the 911 operator was asking me for information. Officer Smith knew that I was on a call with 911, but kept continually interrupting that call, which I verbally informed him was illegal. He sarcastically stated that he was glad I was trying to educate him on the law and then told Officer Chavez that he had tried multiple attempts to get me out of the vehicle, which to my knowledge he had not. Officer Chavez got my attention and asked me to get out of the car or he would have me removed. I was surprised by this quick, unwarranted escalation to threats of physical harm, due to the fact that I had not heard any request from Officer Smith for me to exit the vehicle. I verbally confirmed with Officer Chavez that he wanted me to get out of the car and upon confirmation, asked the officers to move out of the way so that I could exit and I tried to do as they asked.

12. As I was exiting the car, Officer Smith did not move out of the way of my car door but rather he stepped in closer making it hard for me to exit. He then reached to shove my door shut in an angry gesture, intentionally hitting my shoulder with his hand as he reached for the car door. I was hoping that Officer Chavez would say something and stop Officer Smith's aggression, but he did nothing. As I started walking, I trying to calm myself and think about what was happening, while also having the 911 dispatcher on the phone. Officer Smith got angry that I wasn't walking at a speed to his liking, and poked me in the back, twice, with his flashlight. I asked him why he was doing that. He didn't answer, but kept frantically barking short angry commands at me like I was an animal he was trying to corral.

13. I repeatedly asked him to deescalate. I turned, carefully walking backwards so that I wouldn't fall over something, but also so that I could keep an eye on Officer Smith and so

he would have to stop poking me in the back with his flashlight.  He stepped in, antagonistically, extremely close to my face and I stepped back.  I asked him to back off, deescalate and give me space.  He repeatedly moved in even closer and closer, so I kept stepping backwards, but carefully and not too quickly so I wouldn't get accused of making an aggressive move.  He kept entering my personal space, with his face inches from mine, and posturing like he wanted to fight me.  I had not been this close to people since the social distancing mandate was put into place, and this was extremely concerning to me.  I needed a moment to collect myself and calm down, but he never afforded me that necessary time and space.  Officer Smith wouldn't give me the time or space to carefully and self-defensively carry out his commands, instead he kept barking one word commands at me non-stop, which was very demoralizing and condescending.  He refused to recognize that I was actually following his commands.  I again asked him repeatedly to deescalate, back off and give me space.  I noticed that he was herding me into a dark unlit area and I began to fear that he wanted to shoot me in the dark.  I was only trying to stand my ground and protect my life.  Every one of the police reports state that they gave me plenty of time to deescalate, however, it is clearly shown in all of the body cam footage that I was never given any time or space to calm down without the officers in extremely close proximity and antagonizing me.

14. At one point, Officer Kurtis Ward ("Officer Ward") held up his hand in the "stop" position signaling to officer smith to back down and Officer Smith backed down a very little amount for about 4 seconds, but then Officer Ward became aggressive and I called him out for being aggressive, then he stated very threateningly, "You haven't seen aggressive!."  This convinced me that this was rapidly becoming an inevitable physical assault upon my

person. Officer Smith pushed me physically, I planted my feet and I told him to keep his hands off of me, but then he grabbed my arm and pulled me to him and then pushed me away, knocking me off balance. He then grabbed me by the waist and threw me to the ground as hard as he could. Once I was on the ground, the officers began yelling "Stop resisting!" over and over like a broken, I began yelling back, "I'm not resisting!" as an attempt to deescalate officer ward who was trying to expedite Taser deployment. Two officers were on top of my body, which was in a very awkward position, and I was handcuffed. I kept telling them to stop hurting me, and they kept saying they were professionals and were not hurting me, but I was in a lot of pain. The officers began to go through my pockets. I told them that this was an illegal search, but Officer Smith said, "No it isn't because you're under arrest." None of the officers had ever told me that I was under arrest. I said, "Under arrest for what? I didn't do anything!" Officer Smith said I was resisting and obstructing. I said "Obstructing what?" How could I be resisting arrest if I was never told that I was under arrest? How could I obstruct if I followed every command he gave me and if there was no arrest to obstruct? Officer Smith had his arm over mine but was asking me to turn over, which I physically couldn't do because he was pressing down on my side. After they went through my pockets, finding absolutely nothing except loose change, I was lifted to my feet. Sometime during this altercation an officer took my phone, told the 911 dispatcher that they had placed me under arrest and hung up my 911 call. I was extremely confused, physically hurt, and very agitated.

15. I was led to a car, my face smashed into the corner where the door opens with bodily force on top of me and I was told to get into the car. There was no possible way for me to move in this position although they kept forcing my face into the corner and demanding that I do

so. Another officer finally got into the car from the other side and helped pull me in, which I thanked him for. I was shut in the car, while the body cam videos then show one officer shutting off his audio, pointing to Officer Smith's camera on his waist and Officer Smith completely removing his body cam and placing it in the car. All officers then gathered with no audio but some video for several minutes. This is extremely suspicious, like they needed to get their stories straight without any evidence to prove that that is what was going on.

16. Officer Smith was to drive me to jail, but before we left, Officer Chavez told Officer Smith to "be careful." I now wonder if he was warning him not to make any more reckless moves, because if he was, it didn't work. Officer Smith drove 90+ miles per hour, even while going through a construction zone, all while texting, changing lanes without signaling, overtaking another speeding car, and playing heavy metal music. I asked him to slow down, but he only gave me the middle finger. I asked if he was going to remember all of this when we went to court, and again all I got was the middle finger. His blatant disregard for traffic laws and careless behavior put my life in danger as well as the other drivers on the road that night. Several times he jerked the wheel overly forcefully, intentionally causing me to slam forcefully into the interior of the police cruiser door. He antagonized me throughout the ride. He insulted me by calling me jobless, although I'm a professional in my field. I didn't want to encourage his behavior so I didn't speak up and argue any points. I had no choice but to sit helplessly handcuffed in the back seat, endure the ride, and hope that I arrived at our destination without further injury. After arriving at the detention center, he winked at me in our reflections while waiting for the detention door to open and I asked him why he kept antagonizing me, but he just got angry and forcefully

yanked me and forced me to go where he wanted me to go. The dash cam and body cam video with all of this activity was not submitted with the other evidence.

17. My rights were violated again and again.

18. To be quite blunt, Officer Smith has a long history of violence and the Department has a history of overlooking that history of violence.

19. On or about August 25, 2015, Officer Smith was one of five officers who fired a gun upon Marvin Maestas ("Mr. Maestas"), when Mr. Maestas was killed by the Department.

20. On or about September 20, 2016, Jessica Guttman ("Ms. Guttman") was parked on the side of the highway with friends looking at horses. Officer Smith falsely stated that there had been a report of suspicious women and demanded her ID, she was taken aback by the aggression towards her and refused to give her ID to him.

21. Ms. Guttman has obvious mental health/disability issues, which Officer Smith ignored. Officer Smith then fiercely handcuffed her, dragged her through the cactus which pulled her dress down from her shoulders to her waist, and he then put his knee in her genital area. Ms. Guttman was detained for several hours while waiting to be released and during this time she had a seizure, which Officer Smith completely ignored.

22. The Department was made to pay $300,000 in damages. Officer Smith was not disciplined, he was only moved from one location to another, from Santa Fe to Albuquerque.

23. Officer Smith is currently the subject of a lawsuit, where Jonathan Molina ("Mr. Molina"), a young Hispanic male, was a passenger in a vehicle that was pulled over on or about July 15, 2018, was assaulted inside of his automobile and shot and killed by Officer Smith.

24. Mr. Molina was hearing impaired and likely did not understand the instructions that were issued by Officer Smith.

25. The incident with the Plaintiff took place on or about May 7, 2021.

26. However, Officer Smith's history of violence has still continued.

27. On or about December 29, 2021 Jesse Morgan ("Mr. Morgan") was nearly side-swiped by Officer Smith, but Officer Smith's report says that Mr. Morgan was aggressively trying to prevent him from merging behind a vehicle to make a traffic stop. However, dash cam video shows no aggression from Mr. Morgan and shows how close Officer Smith came to hitting Mr. Morgan's car. Mr. Morgan followed Officer Smith to a parking lot and asked to speak with Officer Smith's supervisor. Officer Smith's report says that Mr. Morgan was "immediately aggressive" shinning lights in his face and yelling, but the body cam video shows that Mr. Morgan was actually quite calm when asking to speak with a supervisor. Officer Smith was the one using an aggressive, antagonistic, condescending and dismissive tone while shining his flashlight in Mr. Morgan's face during the initial contact and placing a spike strip under their car as if they were under investigation for something criminal.

28. When a supervisor arrived and received Officer Smith's version of the interaction, he went to Mr. Morgan's car. They continued to record, as you can tell by the light continuously moving in Mr. Morgan's car. The supervisor then tried to grab what is obviously a flashlight, but which the supervisor's report states was an unknown bright light suddenly in his eyes and he was afraid it could be a gun. In reality, it is obvious that the light was on the whole time and that he didn't want them to shining it in his face. Much like Officer Smith's behavior in which the initial contact is antagonistic and controlling, the supervising officer's initial contact with Mr. Morgan led to supervising officer getting angry, and trying to take the flashlight away from Mr. Morgan.

29. At this time Officer Smith joins his supervisor, drags Mr. Morgan out of his car and, much like Officer Smith's interaction with the Plaintiff, slams him to the ground, and then puts his elbow into Mr. Morgan's neck for added pain and pressure. Officer Smith never used his words to ask Mr. Morgan to step out the vehicle or stated that Mr. Morgan was under arrest. All of this movement is caught on the dash cam and body cam footage. Only edited portions of the footage was used in the news story, and the reporter only reads the police report, which does not match the video evidence at all.

30. Officer Kevin Smith's ongoing conduct needs to be stopped.

31. In *City of Las Cruces v. Betancourt,* 105 N.M. 655, 735 P.2d 1161 (1987), the New Mexico Supreme Court articulated eight guidelines for determining whether vehicle checkpoints satisfy the Fourth Amendment's reasonableness standard. First, supervisory officers, not officers in the field, must decide to set up a checkpoint, select the site, and establish procedures for conducting it. *See* 105 N.M. at 658, 735 P.2d at 1164. Second, the discretion of officers should be restricted -- vehicles should not be stopped randomly; every vehicle should be stopped or a mathematical selection formula should be used. *See* 105 N.M. 658-59, P.2d at 1164-65. Third, safety measures aimed at warning approaching traffic should be employed. *See* 105 N.M. 659, P.2d at 1165. Fourth, the checkpoint should be established in a reasonable location, one taking account of intrusiveness and safety of the public. *See id.* Fifth, the time and duration of a checkpoint should be reasonable. *See id.* Sixth, the public nature of the checkpoint should be immediately apparent to approaching vehicles -- officers in the field should be uniformed and police cars should be marked. *See id.* Seventh, the average length of time that a motorist is detained at the checkpoint and the degree of intrusiveness should be minimized; motorists should be detained only long

enough to effectuate the purpose of the stop. *See id.* Finally, the reasonableness of checkpoints will be enhanced if they are widely publicized. *See id.*

32. The DUI/DWI checkpoint was unreasonable, under the above guidelines.

## <u>COUNT I</u>

### 42 U.S.C. § 1983 - FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS

*Plaintiff v. Kevin Smith*

33. Plaintiff re-alleges the allegations contained in the above paragraphs, as if fully set forth herein.

34. The conduct by the officers identified in this count and described herein violated the Plaintiff's Fourth Amendment rights and Fourteenth Amendment rights.

35. These constitutional violations were caused by lack of training and supervision.

36. As a further direct and proximate result of the conduct by the officers identified in this count, Plaintiff suffered loss of his liberty and freedom and mental anguish. These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff prays for the following relief:

A.    Judgment for compensatory damages;
B.    Judgment for exemplary or punitive damages;
C.    Cost of suit;
D.    Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;
E.    Trial by jury as to all issues so triable; and
F.    Such other relief as this Honorable Court may deem just and appropriate.

## COUNT II

**MUNICIPAL LIABILITY FOR UNCONSTITUTIONAL CUSTOM OR POLICY (42 U.S.C. § 1983)**

*Plaintiff v. New Mexico Department of Public Safety*

37. Plaintiff re-alleges the allegations contained in the above paragraphs, as if fully set forth herein.

38. On and for some time prior to May 7, 2021 (and continuing to the present date) Defendant, New Mexico Department of Public Safety, deprived Plaintiff of the rights and liberties secured to him by the Fourth and Fourteenth Amendments to the United States Constitution, in that said Defendant and their supervising and managerial employees, agents, and representatives, acting with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general by knowingly maintaining, enforcing and applying an official recognized custom, policy, and practice of allowing officers to engage in .

39. The policies, practices, and customs implemented and maintained and still tolerated by Defendant, New Mexico Department of Public Safety.

40. As a further direct and proximate result of the conduct of Defendant, New Mexico Department of Public Safety, Plaintiff suffered loss of his liberty and freedom and mental anguish. These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff prays for the following relief:

G.     Judgment for compensatory damages;

H.     Judgment for exemplary or punitive damages;

I.     Cost of suit;

J.     Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

K.     Trial by jury as to all issues so triable; and

L.     Such other relief as this Honorable Court may deem just and appropriate.

## COUNT III

### MUNICIPAL LIABILITY FOR FAILURE TO TRAIN (42 U.S.C. § 1983)

*Plaintiff v. New Mexico Department of Public Safety*

41. Plaintiff re-alleges the allegations contained in the above paragraphs, as if fully set forth herein.

42. The training policies of the Defendant, New Mexico Department of Public Safety were not adequate to train its police officers, including but not limited to, Kevin Smith with regards to unreasonable searches and seizures. As a result, the New Mexico Department of Public Safety police officers, including Kevin Smith, are not able to handle the day to day interactions of drivers at DUI/DWI checkpoints. These inadequate training policies existed prior to the date of this incident and continue to this day.

43. This failure of the New Mexico Department of Public Safety showed an intentional, reckless, and callous disregard for the rights of drivers at DUI/DWI checkpoints, such as the Plaintiff and this was willful, wanton, oppressive, malicious, fraudulent, and extremely offensive and unconscionable to any person of normal sensibilities.

44. As a further direct and proximate result of the conduct of Defendant, New Mexico Department of Public Safety Plaintiff suffered loss of his liberty and freedom and mental anguish. These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff prays for the following relief:

M.     Judgment for compensatory damages;
N.     Judgment for exemplary or punitive damages;
O.     Cost of suit;
P.     Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;
Q.     Trial by jury as to all issues so triable; and
R.     Such other relief as this Honorable Court may deem just and appropriate.

## COUNT IV

### FAILURE TO RENDER AID (New Mexico Common Law)

*Plaintiff v. Kevin Smith*

45. Plaintiff re-alleges the allegations contained in the above paragraphs, as if fully set forth herein.

46. After Defendant, Kevin Smith attacked, Plaintiff was in significant need of medical care. It was obvious by looking at Plaintiff that he needed immediate medical attention.

47. Defendant, Kevin Smith failed to render aid to Plaintiff, despite the known risk to his life, health and safety.

48. Kevin Smith's failure to render aid to Mr. Molina was a proximate cause of Plaintiff's injuries.

WHEREFORE, Plaintiff prays for the following relief:

S.     Judgment for compensatory damages;
T.     Judgment for exemplary or punitive damages;
U.     Cost of suit;
V.     Reasonable attorney fees;
W.     Trial by jury as to all issues so triable; and
X.     Such other relief as this Honorable Court may deem just and appropriate.

## COUNT V

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (New Mexico Common Law)**

*Plaintiff v. New Mexico Department of Public Safety and Kevin Smith*

49. Plaintiff re-alleges the allegations contained in the above paragraphs, as if fully set forth herein.

50. It is fundamental that in order to establish a cause of action for emotional distress, the plaintiff must show (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress.

51. The actions of the Defendants were intended to cause the Plaintiff serious emotional distress, the Defendants' conduct was extreme and outrageous and as a further direct and proximate result of the conduct of Defendants, Plaintiff suffered loss of his liberty and freedom and mental anguish. These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil and constitutional rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff prays for the following relief:

Y.      Judgment for compensatory damages;
Z.      Judgment for exemplary or punitive damages;
AA.    Cost of suit;
BB.    Reasonable attorney fees;
CC.    Trial by jury as to all issues so triable; and
DD.    Such other relief as this Honorable Court may deem just and appropriate.

## COUNT VI

**BATTERY (New Mexico Common Law)**

*Plaintiff v. New Mexico Department of Public Safety and Kevin Smith*

52. Plaintiff re-alleges the allegations contained in the above paragraphs, as if fully set forth herein.

53. Battery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner, N.M. Stat. Ann. § 30-3-4 (1963). A tortfeasor is liable for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results. The intent required to commit battery extends only to the physical touching at issue and not to the resulting harm. *Milliron v. Cnty. of San Juan*, 2016-NMCA-096 (2016 N.M. App. LEXIS 92 2016)

54. On or about April 7, 2021, New Mexico Governor Michelle Lujan Grisham signed the New Mexico Civil Rights Act — also known as House Bill 4 — advancing fair and equal treatment under the law.

55. The legislation effectively bans qualified immunity — a judicial doctrine that shields state actors, including law enforcement officials, from liability, even when they knowingly break the law. New Mexico is now the second state to ban qualified immunity, following Colorado which enacted legislation to end the practice in June 2020.

56. Under New Mexico's new law, a person has the right to sue the state, a city, or county, when their rights under the state's constitution have been violated, such as in cases

involving police misconduct. With the passing of this law, residents of New Mexico will finally be able to hold officials who engage in wrongdoing accountable.

57. As a further direct and proximate result of the conduct of Defendants, Plaintiff suffered loss of his liberty and freedom and mental anguish. These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil and constitutional rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff prays for the following relief:

EE.    Judgment for compensatory damages;
FF.    Judgment for exemplary or punitive damages;
GG.    Cost of suit;
HH.    Reasonable attorney fees;
II.    Trial by jury as to all issues so triable; and

JJ.    Such other relief as this Honorable Court may deem just and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court:

(a) Declare that Defendants' acts and conduct constituted violations of the Fourth and Fourteenth Amendments of the U.S. Constitution under 42 U.S.C. §§ 1983;

(b) Judgment in Plaintiff's favor as to all claims for relief;

(c) Award compensatory damages for the injuries Plaintiff sustained due Defendants' conduct for all economic and non-economic damages for medical costs, pain, suffering, humiliation and emotional distress;

(d) Award punitive and exemplary damages, pre-judgment interest, post-judgment interest, costs, and other reasonable expenses incurred in maintaining this action, and the reasonable attorney's fees and costs incurred in maintaining this action;

(e) All other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues within this Complaint.

RESPECTFULLY SUBMITTED this 28 day of March, 2022.

By: _____

Plaintiff JARROD BLANDIN